REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 737

September Term, 2013

---

LAUREN MCCLANAHAN

v.

WASHINGTON COUNTY DEPARTMENT
OF SOCIAL SERVICES

---

Eyler, Deborah S.
Woodward,
Reed,

JJ.

---

Opinion by Woodward, J.

---

Filed: July 31, 2014

In December 2010, appellee, the Washington County Department of Social Services (the "Department"), found appellant, Lauren McClanahan, responsible for indicated child abuse by mental injury of her then five-year-old daughter, Raven H. ("Raven"). The finding of child abuse stemmed from appellant's repeatedly making sexual abuse allegations against Raven's father and taking the child to multiple sexual abuse examinations.

Appellant appealed the Department's finding to the Office of Administrative Hearings ("OAH") in January 2011, and an administrative law judge ("ALJ") affirmed the Department's finding in October 2011. Appellant then sought judicial review of the ALJ's determination in the Circuit Court for Washington County, which affirmed the ALJ's decision on May 2, 2013. Appellant filed a timely appeal to this Court on May 30, 2013, and presents four questions for our review, which we have rephrased and consolidated into three:[1]

---

[1] Appellant's original questions read as follows:

1.  Whether the OAH decision was supported by competent, material, and substantial evidence in light of the entire record, or was otherwise arbitrary or capricious?

2.  Whether purported subconscious efforts by a mother to have her daughter remain close to her are sufficient to find that the mother is responsible for indicated mental injury of a child under the child abuse laws?

3.  Whether the OAH decision resulted from or was affected by the ALJ's decision to admit evidence in violation of both Maryland and Pennsylvania law governing privilege?

4.  Whether the OAH decision against the Petitioner violated the immunity provisions of Family Law Article § 5-708 and Courts and Judicial Proceedings Article § 5-620?

1.    Did the record contain competent, material, and substantial evidence sufficient to support the ALJ's decision?

2.    Did the ALJ err by admitting evidence that violated the privilege laws of Maryland and Pennsylvania?

3.    Did the ALJ violate the immunity provisions of the Family Law and Courts and Judicial Proceedings Articles?

For the reasons set forth below, we answer question one in the affirmative, and conclude that questions two and three have not been preserved for our review. Accordingly, we affirm the judgment of the circuit court.

## BACKGROUND

### *Family Background*

On May 6, 2005, Raven was born to appellant and her then-husband John H. Each parent had substance abuse problems and accused the other of domestic violence. Appellant also accused Mr. H. of sexually abusing her. On August 2, 2006, appellant and Mr. H. separated after nineteen years of marriage, and they legally divorced on February 25, 2008.

After her parents' divorce, Raven lived with appellant, who had primary physical custody, and had unsupervised visitation with her father three weekends per month and one weeknight per week. Mr. H. remarried, as did appellant. Appellant's second husband, Michael M., died of a heart attack in December 2009. Appellant now lives with a live-in partner.

### *Original Abuse Allegations & Investigations*

During the approximately three-and-a-half year period from June 2007 to November

2

2010, appellant took Raven to the hospital nine times for physical examinations related to sexual abuse allegations. The examinations shared two common features: first, the evaluations occurred after Raven made sexual abuse allegations following visitation at her father's home; second, Raven presented with physical symptoms immediately prior to each examination.[2] None of these examinations, however, confirmed that Raven had been sexually abused.

At first, Raven alleged that her father or step-brother had molested her or penetrated her with small objects, and later described assaults involving a needle, cream, or the family's pets. Raven generally made these accusations in the presence of her mother. The allegation Raven made on June 23, 2010 typified the nature of the child's claims. On that day, Raven informed her mother and her babysitter that her father "poked me with a needle in my front bottom." Raven later told a nurse that she felt "sad [because] of how I got hurt," and that the needle was "blue [with] 5 green stripes."[3]

Raven displayed very similar physical symptoms at the time of each appointment, including genital redness and swelling, and occasionally vaginal discharge, which indicated

---

[2] Appellant also took Raven to eight appointments with her pediatrician for symptoms similar to those that prompted the physical exams.

[3] Raven elaborated on this allegation by stating that her father used the needle on her because "he had to sew up my front bottom and back bottom up because the [family's pet] goat bit through it." Such fantastical sounding allegations were not standard for Raven, but also not uncommon. For example, Raven also told hospital staff on another occasion that a "monster came from a cave and touched her."

3

a urinary tract infection.[4]  At the second forensic examination, on February 21, 2008, Dr. Ruth Ann Dwyer diagnosed Raven with "vulvitis–normal variant in pre-pubertal female," and the terms "vulvitis" and "vaginitis" were often used to described the irritation experienced by Raven.

Both the irritation and the infections observed in Raven are common in children her age, and can often be attributed to poor hygiene.  At the February 2008 visit, Dr. Dwyer noted toilet paper on Raven's genitals, an indication of poor hygiene, and discussed "routine good hygiene care" with appellant.  On more than one occasion, appellant received education about how to prevent the irritation of Raven's genitals, which included the child's avoiding bubble baths and wearing underwear overnight.

Dr. Dwyer also reported in Raven's medical chart that a "normal exam does not exclude a history of sexual abuse," and personally explained to appellant that abuse could not be ruled-out.  As indicated above, however, no examination revealed definitive signs of sexual abuse.  In addition, and importantly, from February 2008 until May 2010, the Department conducted fourteen sexual abuse investigations, all of which ruled out sexual abuse.

---

[4] The one exceptional forensic finding consisted of a "black course hair" found on Raven's genitals on November 17, 2010, during a doctor's visit at which Raven referenced sexual abuse. Physician's Assistant Jane Shughart determined that the hair "did not look like a hair from a head."  Under instructions from Shughart, appellant took Raven to Washington County Hospital, where a police officer interviewed Raven.  The hospital did not examine Raven or the hair based on instructions from the Department.

4

*Mental Injury Inquiry & Evaluations of Raven*

On May 14, 2010, the Department began an investigation into appellant for causing mental injury to Raven. Dr. Carlton E. Munson, a licensed certified social worker with a Ph.D. in clinical social work, evaluated Raven for mental injury on July 16 and August 4, 2010, after receiving a referral from Bruce McCarthy, an investigator from Child Protective Services ("CPS"). Previously, Dr. Munson assessed Raven on July 24 and September 10, 2008 upon referral from CPS.

On October 29, 2010, Dr. Munson finalized his report on Raven, and diagnosed the child as having indications of mental injury. Dr. Munson determined that Raven had a "positive insecure attachment to her mother and father," and categorized her disorder under Axis I of the Diagnostic and Statistical Manual of Mental Disorders (DSM) as "Parent-Child Relational Problem." This finding echoed the diagnosis made by Raven's therapist, Amy Hershey, whom Dr. Munson interviewed. Hershey diagnosed Raven under Axis I as having an "Adjustment Disorder with Mixed Anxiety and Depressed Mood," related to "dealing with parental conflict and disagreement between households." Thus, both professionals determined that Raven had a mental injury that implicated her relationship with her family.

According to Dr. Munson's report, Raven's mental injury manifested itself in various forms of emotional distress. Dr. Munson observed that Raven demonstrated neediness and insecurity around her immediate family, but in particular around appellant. Raven also displayed symptoms of generalized anxiety. Dr. Munson noted that Raven suffered from

5

abnormally severe sleep disturbances and nightmares. Finally, Dr. Munson commented on the unusual nature of the sexual abuse allegations Raven made during his evaluation and the therapy sessions with Hershey. According to Dr. Munson, Raven generally made these disclosures to her family and therapists, but not to investigators, and exhibited a willingness to expose herself.

Dr. Munson further observed that Raven's mental injury had impaired Raven's emotional, social, and intellectual function. Dr. Munson reported that Raven was "currently having functional problems at school." Dr. Munson gave an IQ test to Raven, which revealed a twenty-six-point discrepancy between the child's verbal and nonverbal scores. Dr. Munson theorized that the discrepancy could be caused by familial trauma. Finally, Dr. Munson's testing demonstrated an "overall decline in meeting milestones" since the evaluations he performed in 2008.

At the end of his report, Dr. Munson offered his opinion on the cause of Raven's mental injury and impairment:

> Based on the scales administered, the clinical interviews conducted, the collateral interviews conducted, and the documents reviewed, **it is my professional opinion that Raven [ ] has been mentally injured** and the source of the mental injury gives indication of being **due to the mother's engaging in conscious or unconscious suggestive utterances to Raven about abuse by the father and engaging in alienating activities related to the father.**

(Emphasis added).

In addition to Dr. Munson, McCarthy contacted Ronald E. Zuskin and requested that

he conduct an assessment of Raven. From August 2010 to October 2010, Zuskin, a licensed certified social worker-clinical, reviewed Dr. Munson's report and interviewed appellant, Hershey, Mr. H., and Mr. H.'s second wife, but did not interview Raven.

Zuskin's assessment of Raven was similar to Dr. Munson's evaluation. Zuskin adopted Hershey's diagnosis of "Adjustment Disorder with Mixed Anxiety and Depressed Mood." Zuskin, like Dr. Munson, also determined that Raven had an unhealthy attachment to her mother, which he described in terms of an "extreme over-involvement, intrusiveness and dominance."

Also like Dr. Munson, Zuskin reported that Raven's functioning had become impaired:

> Raven's relations with authority figures, her peer relations, and her own reactivity to disruption in the environment indicate that not only is her current level of functioning impaired, but that without treatment and significant environmental changes she is a risk of greater disruption and regression.

Zuskin also concluded that appellant exploited Raven through making repeated sexual abuse allegations, and that such exploitation caused Raven's impairment.

### *Procedural History*

On December 15, 2010, the Department notified appellant that it had determined that she was responsible for indicated child abuse by mental injury. On January 14, 2011, appellant appealed the Department's finding of indicated child abuse-mental injury to the OAH. The ALJ held a contested case hearing on the matter on August 16 and September 19,

7

2011.  On October 25, 2011, the ALJ issued a written decision, in which she concluded that

(1) the finding of indicated child abuse-mental injury was supported by credible evidence and

was consistent with the law, and (2) appellant was responsible for the indicated abuse.[5]

On November 23, 2011, appellant petitioned the Circuit Court for Washington County

for judicial review of the ALJ's decision.  On May 2, 2013, the circuit court affirmed the

ALJ's decision.  On  May 30, 2013, appellant filed a timely notice of appeal to this Court.

## STANDARD OF REVIEW

In *Charles County Department of Social Services v. Vann*, 382 Md. 286 (2004), the

Court of Appeals set forth in detail the appropriate standard of judicial review of the final

decision of an administrative agency:

> As a court sitting in judicial review of an administrative agency
> decision, this Court reviews the decision in the same posture as that
> of the courts below.  That is to say, we reevaluate the decision of the
> agency under the same statutory standards as would the circuit court,
> and we do not employ those standards to reevaluate the decision of the
> circuit or intermediate appellate court.
>
> ***
>
> [Maryland Code (1984, 1999 Repl. Vol., 2003 Cum. Supp.),
> § 10-222(h) of the State Government Article ("SG")] sets forth
> standards of judicial review over agency decisions in contested cases
> and varies those standards depending on the type of agency

---

[5] The Department also investigated appellant for child neglect, and, on October 4, 2010, made a finding of indicated child neglect.  Appellant appealed this finding as well, and the ALJ determined that the finding of indicated child neglect should be modified to ruled-out child neglect.  The Department did not seek judicial review of the ALJ's decision in this regard.

determination under scrutiny. With regard to agency factual determinations, the standard of review is whether the finding is "unsupported by competent, material, and substantial evidence in light of the entire record as submitted," also known as substantial evidence review. Under substantial evidence review of an agency's factual findings, a court is limited to ascertaining whether a reasoning mind could have reached the same factual conclusions reached by the agency on the record before it.

With regard to agency legal conclusions, judicial review is less deferential to the agency. When an agency makes "conclusions of law" in a contested case, the [Administrative Procedure Act] permits the court, on judicial review, to decide the correctness of the agency's conclusions and to substitute the court's judgment for that of the agency's. Even with conclusions of law, however, an agency's legal interpretation of the statute it administers or of its own regulations is entitled to some deference from the courts.

Other agency decisions fall within categories that are neither legal conclusions nor factual findings, and some fall within both. These latter sort commonly are known as "mixed questions of law and fact" or applications of law to facts: The agency has correctly stated the law and its fact-finding is supported by the record, but the question is whether it has applied the law to the facts correctly. When the agency decision being judicially reviewed is a mixed question of law and fact, the reviewing court applies the substantial evidence test, that is, the same standard of review it would apply to an agency factual finding.

*Id.* at 294-96 (citations omitted).

## DISCUSSION

### I. Substantial Evidence & Legal Error

Appellant's main argument is that the record does not support the factual findings and legal conclusions made by the ALJ. The ALJ concluded her opinion by stating that "[a]ppellant's act of making multiple allegations of sex abuse of Raven by her father and

subjecting Raven to repeated sexual abuse exams constitutes child abuse mental injury." The ALJ supported this conclusion with a lengthy review of the evidence, in which she heavily relied upon the evaluations of Dr. Munson and Zuskin:

> This matter is complicated from th[e] standpoint [of assessing mental injury, because] the family dynamics and Raven's psychological state are intertwined and complex. **I have given significant weight to both Dr. Munson's and [ ] Zuskin's test and reports**. Their reports were thorough and provided clear and rational explanations for how the data they collected during their assessments supported their conclusions. . . . Both of the assessments address the information required by [the regulation concerning mental injury].

(Emphasis added).

Accordingly, appellant attacks the ALJ's findings of fact by challenging the conclusions of Dr. Munson and Zuskin. Notably, appellant does not attack the evaluator's conclusions regarding the nature of Raven's mental injury or her impairment, described above, but instead objects to: (1) the admissibility of the expert opinions and their methodologies generally, and (2) the sufficiency of the experts' findings regarding *the cause* of Raven's mental injury.

Furthermore, as part of her attack on sufficiency of the evidence with regard to causation, appellant challenges the ALJ's legal conclusion regarding scienter. Appellant argues that the ALJ erred by concluding that she was responsible for indicated child abuse by mental injury without determining whether she acted with the requisite intent. For the reasons set forth below, we reject appellant's arguments.

10

A. Admissiblity

*"Credibility" Experts & The* Frye *Standard*

Appellant's first claim involves the admissibility of the expert opinions and assessments proffered by Dr. Munson and Zuskin. Appellant first contends that the assessments of Dr. Munson and Zuskin "intruded into the power of the judge to assess credibility." More specifically, appellant asserts that the evaluators dismissed Raven's accusations based on their own assessments of the girl's credibility. Accordingly, appellant concludes that "[e]xpert testimony that encroaches [on] the judge's function to adjudicate credibility is inadmissible."

Appellant also argues that "neither Dr. Munson nor [ ] Zuskin provided the foundation of scientific acceptance for their opinions" as required by *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923). Appellant claims that neither expert established that his assessment tools demonstrated scientific reliability and validity for the purpose of establishing a mental injury to a child as required by *Frye*.

Appellant's arguments regarding the experts' improper credibility assessments and the *Frye* standard have been waived. *See Delmarva Power & Light Co. v. Pub. Serv. Comm'n of Md.*, 370 Md. 1, 32, *aff'd on other grounds*, 371 Md. 356 (2002) ("We do not allow issues to be raised for the first time in actions for judicial review of administrative agency orders entered in contested cases because to do so would allow the court to resolve matters *ab initio* that have been committed to the jurisdiction and expertise of the agency.").

11

Appellant never raised these issues before the ALJ, and in fact she accepted Dr. Munson and Zuskin as experts and allowed their reports and expert opinions to be admitted into evidence without objection.

## B.  Description of Bad Acts

Appellant next attacks the substance of the evidence presented against her.  We observe at this junction that to reach a finding of "indicated" requires that "there is credible evidence, which has not been satisfactorily refuted, that abuse, neglect, or sexual abuse did occur."  Md. Code (1984, 2012 Repl. Vol.), § 5-701(m) of the Family Law Article ("FL").  Child abuse is defined as follows:

> (b) *Abuse.* — "Abuse" means:
>
> (1) the physical or mental injury of a child by any parent or other person who has permanent or temporary care or custody or responsibility for supervision of a child, or by any household or family member, under circumstances that indicate that the child's health or welfare is harmed or at substantial risk of being harmed; or
>
> (2) sexual abuse of a child, whether physical injuries are sustained or not.

FL § 5-701(b).

COMAR 07.02.07.12(A)(3) (2014)[6] sets forth the criteria for a finding of indicated child abuse by mental injury:

> (3) Abuse—Mental Injury.  A finding of indicated child abuse with mental injury is appropriate if there is credible evidence, which

---

[6] Unless otherwise indicated, all citations to COMAR refer to the 2014 regulations.

12

has not been satisfactorily refuted, that the following four elements are present:

(a) A current or prior mental injury characterized by an observable, identifiable, substantial impairment to the child's mental or psychological ability to function, which may be shown by the need for specific psychiatric, psychological, or social work intervention;

(b) The mental injury was caused by a parent, a caretaker, or household or family member;

(c) The alleged victim was a child at the time of the incident; and

(d) The nature and extent of the mental injury indicate that the child's health or welfare was harmed or was at substantial risk of harm.

FL § 5-706 requires that any investigation into mental injury include two assessments by licensed physicians, licensed psychologists, or licensed social workers. FL § 5-706(d)(2). COMAR 07.02.07.09(B)(1)(b) sets forth the requirements of the assessments:

(b) The professional assessment shall include:

(i) A determination whether the child has sustained a mental injury;

(ii) If applicable, a description of observable, identifiable, and substantial impairment of the child's mental or psychological ability to function; and

**(iii) If applicable, an explanation of the act or omission that is believed to have caused the mental injury.**

(Emphasis added).

Based on this statutory and regulatory framework, appellant argues that the

13

Department failed to sufficiently describe the "*act or omission* that is believed to have caused the mental injury," and thus concludes that the ALJ had no basis on which to make a finding of indicated child abuse by mental injury.  *See* COMAR 07.02.07.09(B)(1)(b)(iii) (emphasis added).  Appellant describes two insufficiencies in this regard that we address in turn.

*Unconscious Acts*

Appellant first asserts that the term "act," as used in COMAR 07.02.07.09(B)(1)(b)(iii), "denotes a finding that the parent's conduct was voluntary and conscious."  Appellant claims that the Department's assessments, conducted by Dr. Munson and Zuskin, described Raven's mental injury as caused by "vague, unintentional acts" that cannot constitute child abuse.

For example, appellant contends that Dr. Munson ascribed Raven's injury to appellant's unconscious behavior.  Appellant supports this position with the following statement from Dr. Munson's report:

> Based on the scales administered, the  clinical interviews conducted, the collateral interviews conducted, and the documents reviewed, it is my professional opinion that Raven [ ] has been mentally injured and **the source of the mental injury gives indication of being due to the mother's engaging in conscious or unconscious suggestive utterances to Raven about abuse by the father and engaging in alienating activities related to the father.**

According to appellant, Zuskin similarly determined that appellant's repeated sexual abuse allegations amounted to "exploitation of Raven," which manifested as "animated closesness and protectiveness [that] inadvertently reinforc[ed]" continued sexual abuse allegations by

14

Raven.

Appellant mischaracterizes the experts' conclusions. Dr. Munson and Zuskin do in fact describe intentional acts as the cause of Raven's mental injury, specifically appellant's utterances and her making of sexual abuse allegations. When the experts referred to "unconscious" and "inadvertent" behavior, they did not intend to define appellant's abusive actions, but rather meant to describe either (1) the motivation behind appellant's actions, or (2) the effects resulting therefrom. In other words, the evaluators indicated that appellant committed these acts without consciously appreciating that (1) they were motivated by her desire to alienate Raven from her father, and (2) that they would cause Raven to repeatedly make false and detrimental sexual abuse allegations. Dr. Munson and Zuskin did not suggest that the "act" that injured Raven was involuntary, like a hiccup or a Tourette's outburst.

This interpretation of the assessments is consistent with the ALJ's understanding of the evidence. After explaining why appellant's sexual abuse allegations were not justified, the ALJ concluded that appellant's actions "*were a result of* her subconscious efforts to have Raven remain close to her." (Emphasis added). In other words, appellant was *motivated* by her "subconscious effort" to keep Raven very close. According to the ALJ, the *act* that caused the injury, however, was the "act of making multiple allegations of sex abuse of Raven by her father and subjecting Raven to repeated sexual abuse exams."

*Speculative Acts & Causation*

As part of her second argument regarding her alleged misconduct, appellant argues

15

that Dr. Munson's and Zuskin's respective references to "utterances" and "exploitation" were unacceptably vague. More specifically, appellant criticizes Dr. Munson's and Zuskin's assessments for presenting circumstantial and non-specific evidence of her abusive behavior that was "never seen or described by any eyewitness."

Appellant also accuses the experts of speculating as to the causal link between appellant's behavior and Raven's mental injury, arguing, for example, that Dr. Munson used Raven's repeated sexual abuse allegations as "a launching point to speculate concerning unobserved acts of mental injury by the mother." Appellant concludes that "nothing scientific showed that the leap from repeated examinations to Raven's symptoms was to any reasonable degree of certainty."

Appellant is correct that her alleged misconduct cannot be reduced to taking Raven to the repeated examinations. Moreover, Dr. Munson and Zuskin did work backwards to some extent, first diagnosing Raven's mental injury and then associating that injury with a recognized pattern of abusive relationships. Contrary to appellant's argument, however, the experts presented evidence establishing that the abusive pattern did in fact exist and that it caused Raven's injury. In the process, the assessments made references to specific acts performed by appellant. We explain below.

Dr. Munson described the exact nature of Raven's mental impairment, which, as stated above, appellant does not dispute. He described her as suffering from anxiety and from "positive insecure attachment to her mother," the latter of which he described as

16

follows:

> [T]he child has an attachment to the parent, but they feel uncertain about the attachment in terms of whether the parent would play the protective role, will be the protector of them.  So, they will also sometimes themselves become protective of the parent if they feel any kinds of distress in the parent.

Dr. Munson based this assessment on clinical evaluations and interviews, and described how Raven had multiple meltdowns in which she exhibited anxiety and protective behavior:

> During the four-hour evaluation session with [appellant], **Raven had three episodes of extreme emotional distress.**  The first episode occurred when I attempted to escort Raven from the waiting room to the evaluation room.  She clutched [appellant], cried and repeatedly stated she did not want to be asked any more questions, **and she did not want her mother to have to fill out any more forms.**

(Emphasis added).  Dr. Munson further observed that Raven's emotional distress was generally more apparent when the child interacted with appellant than it was when she visited with her father.

Zuskin provided the best explanation of the mechanism that caused Raven's impairment.

> The literature on false allegations lists a type of falsehood know as "exaggerated positive feedback."  In such instances the child senses the parent's need to hear certain things said. The parent responds with animated closeness and protectiveness, inadvertently reinforcing such behavior in the child.

Zuskin categorized this pattern of behavior as a form of "exploitation," manifesting in this case as "extreme over-involvement, intrusiveness and dominance" on the part of

17

appellant. The positive feedback loop described by Zuskin also explains how appellant's behavior caused Raven's symptomatic anxiety and inappropriate protectiveness. Appellant's "need to hear certain things" put pressure on Raven to provide for her mother and protect her mother from any dissatisfaction when those needs were not met.

The experts pointed to evidence demonstrating that the positive feedback loop existed between appellant and Raven. Zuskin stated that the "cycle of making statements about abuse seems inextricably linked to visitation," because Raven's disclosures always occurred during reunions with appellant. This indicated to Zuskin that the abuse allegations were "rituals for re-establishing closeness," *i.e.* reinforcing mutual protectiveness that comprised the positive feedback loop. Zuskin also noted that a link existed between the timing of appellant's accusations of abuse and declines in Raven's conditions. For example, Raven experienced a "regression around the time of another sexual abuse allegation/investigation being made," after she had recovered from a previous regression triggered by her stepfather's death.

The positive feedback loop was also indicated as a cause of Raven's mental injury, because Dr. Munson and Zuskin excluded other possible sources of injury. Zuskin observed that Raven's allegations did not include the "elaborative detail" associated with statements about sexual abuse typically revealed by three- to five-year old children. Dr. Munson noted that Raven "showed no sexual behavior symptoms that are typical of a child that has experienced sexual abuse" and also observed that Raven's affectionate relationship with her

18

father was not typical of a child who was being sexually abused by that parent. Hershey informed Zuskin that "Raven does not present with sexual-abuse specific symptoms or behaviors, but more generalized symptoms of trauma." Finally, according to the ALJ, there was "absolutely no medical evidence of any injury consistent with ongoing sexual abuse."

Dr. Munson also determined that inheritable mental illness as the source of Raven's impairment was unlikely, because children her age do not normally present with such disorders. Dr. Munson asserted that, with regard to Raven's "developmental setbacks," the "only factor present is the repeated allegations of sexual abuse initiated by the mother."

Lastly, the assessments of Dr. Munson and Zuskin provide specific examples of appellant's misconduct. Both Dr. Munson and Zuskin pointed to appellant's making allegations of abuse and taking Raven to exams, actions that they placed in the context of the positive feedback loop as a trigger for Raven to assert an unhealthy protectiveness of her mother.

There were also examples of negative utterances. During the forensic exams, appellant expressed frustration about the legal process not taking the sexual abuse allegations seriously. On one occasion, appellant told the forensic nurse at Chambersburg hospital that "the Judge wont [sic] help her. They keep sending her back with her dad." Such comments gave Raven the impression that her mother was seeking something from the exams that she was not receiving, which Raven would then try to provide. Similarly, appellant rated Raven as having highly elevated trauma indicators on Dr. Munson's assessment, which suggested

19

to Dr. Munson that appellant may have been "faking bad"and creating a negative image of Raven.

We conclude that the reports of Dr. Munson and Zuskin provide sufficient evidence of what acts appellant committed and how those acts caused Raven's mental injury. The ALJ accepted the "exaggerated positive feedback" loop as the cause of Raven's mental injury:

> It is the opinion of Dr. Munson that Raven has been mentally injured and that the source of the injury is [ ] [a]ppellant's exploitation of Raven by her use of sexual abuse allegations, investigations and examinations which encourages the development and reinforcement of aberrant behavior by drawing Raven in a closer relationship to [ ] [a]ppellant.
>
> ***
>
> Zuskin attributed the injury to [ ] [a]ppellant's exploitation of Raven. He explained that [ ] [a]ppellant's sexual abuse allegations that have resulted in exams and investigations constitute "extreme over involvement, intrusiveness, and dominance." . . . He stated that in his opinion Raven sensed [ ] [a]ppellant's need to hear such statements and when [ ] [a]ppellant responded with animated protectiveness and closeness, she was reinforcing Raven's behavior.

Therefore, we hold that a reasoning mind, taking into account the facts presented and any reasonable inferences drawn therefrom, could have made the same findings as the ALJ. Accordingly, the ALJ's decision was supported by "competent, material, and substantial evidence." SG § 10-222(h) (1984, 2009 Repl. Vol.).

## C. Lack of Scienter

Appellant argues that the ALJ erred by failing to determine whether appellant had intentionally or recklessly injured Raven. In other words, appellant contends that a finding of indicated child abuse must include some element of scienter. Appellant claims that

20

without a scienter requirement, the sphere of parental action that could cause abuse by mental injury would become unconscionably vast:

> Likewise, the parent's choice of the wrong school, public or private, or insistence on home schooling, could be indicated child abuse if some agency-appointed physician, psychologist, or social worker disagreed and opined that such had caused an "impairment"of the child's "mental or psychological ability to function."

Appellant asserts that, under *In re Yve S.*, 373 Md. 551 (2003), such a broad application of the State's power to find indicated child abuse is unconstitutional, because it would infringe on a "parent's Fourteenth Amendment liberty interest in raising his or her children as he or she sees fit, without undue interference by the State." According to appellant, a scienter requirement of either intent or recklessness would be an appropriate limitation on the State's power.

Appellant also claims that the scienter requirement already exists in the context of indicated physical child abuse. Appellant cites to *Taylor v. Harford County Department of Social Services*, in which the Court of Appeals determined that, "where an act by a parent or caregiver is injurious to that person's child, and the injury was unintentional, under Title 5 of the Family Law Article and COMAR 07.02.07.12, *the injurious act should not constitute 'indicated' child physical abuse unless it can be shown to have been reckless conduct*." 384 Md. 213, 216 (2004) (emphasis added).

The Department counters that *Taylor* does not apply to the case *sub judice*, because *Taylor* involved indicated physical child abuse, and not abuse by mental injury. The

21

Department observes that the physical abuse regulation relevant to the *Taylor* decision contained an explicit scienter element. By contrast, the Department asserts, the mental injury regulation does not contain any scienter requirement, and that the "legislative history confirms the plain statutory meaning."[7]

The parties' arguments essentially pit the statute and regulations against the *Taylor* decision. After careful consideration of each argument, we agree with the Department that no scienter requirement is required for a finding of indicated child abuse by mental injury.

*Scienter in Title 5 of the Family Law Article & COMAR*

---

[7] The Department also claims that the scienter issue is not preserved for appellate review, because appellant did not raise it before the ALJ. Like the circuit court, we reject this argument. The scienter issue is integral to the legal disposition of this matter and thus is preserved. *See Eng'g Mgmt. Servs., Inc. v. Md. State Highway Admin.*, 375 Md. 211, 235 (2003). The Court of Appeals stated in *Engineering Managment Services, Inc.*:

> The [agency] argues, and the Court of Special Appeals agreed, that the issue of the [Board's] failure to promulgate rules was not preserved for review as [the appellant] failed to raise the issue during the proceedings before the [Board]. Judicial review of administrative decisions generally is limited to the issues raised before the agency. **We reach this issue, however, not because [the appellant] raised it on appeal, but rather because it is an integral, and thus unavoidable, component of our determination of the properly raised issue of whether the [Board's] grant of summary disposition was appropriate in this case.** This is because the [Board's] failure to adopt pertinent procedural rules in the case *sub judice* interferes with the ability of the courts to perform their constitutional function of review.

*Id.* at 235 (citations omitted).

The Department correctly states that the statute and regulations pertaining to indicated child abuse by mental injury do not include a scienter element. As indicated above, a parent must simply have "caused" the mental injury. COMAR 07.02.07.12(A)(3)(b). The statute defines "mental injury" as an "observable, identifiable, and substantial impairment," but does not describe the mental state associated with inflicting the injury. FL § 5-701(r).

Also, as the Department pointed out, the statutory and regulatory scheme does not reveal any intention on the part of the legislature or agency to require a scienter element in cases of indicated child abuse by mental injury. For example, the definition of "ruled out" child abuse in COMAR 07.02.07.12 specifically requires the presence of scienter vis-a-vis physical injury, but does not extend such requirement to mental injury:

> C. Ruled Out Child Abuse. A finding of ruled out child abuse is appropriate if child abuse did not occur. A finding of ruled out may be based on credible evidence that:
>
> (1) **There was no physical or mental injury** or, in the case of suspected sexual abuse, no sexual molestation or exploitation;
>
> (2) **In the case of physical abuse**:
>
> (a) The alleged abuser was not responsible for the injury for reasons including, but not limited to, one of the following:
>
> (i) **The contact with the child was accidental and unintended and under the circumstances, the injury was not foreseeable[.]**
>
> ***

COMAR 07.02.07.12(C) (emphasis added). The presence and then absence of language defining or describing child abuse by physical injury and by mental injury is significant in

23

the construction of the regulation:

> "[W]hen the legislature [or agency] uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended. In like manner, **where the legislature has carefully employed a term in one place and excluded it in another, it should not be implied where excluded. The use of different terms within related statutes generally implies that different meanings were intended**."

*Toler v. Motor Vehicle Admin.*, 373 Md. 214, 223-24 (2003) (first alteration in original) (emphasis added) (quoting 2A Norman J. Singer, *Sutherland Statutes and Statutory Construction* § 46.06 (6th ed. 2000)); *see also Brown v. Brown*, 287 Md. 273, 277 (1980) ("Generally speaking, the same rules that are applicable to the construction of statutory language are employed in interpreting constitutional verbiage[.]").

The legislative history of the mental injury statute itself is also instructive. As appellant observed, the legislature adopted child abuse by mental injury in 1994 for "the purpose of . . . altering the definitions of child abuse and neglect; . . . requiring the investigation to include a certain assessment if mental injury is suspected[.]" 1994 Md. Laws, Chap. 728, at 3232-33. Appellant notes that these changes were necessary in order to maintain compliance with federal law and eligibility for federal funds. The federal regulation, however, never defined mental injury. *See* 45 C.F.R. § 1340.2(d) (2013). Ultimately, the statute and regulations pertaining to mental injury simply do not contain a scienter requirement.

24

*The* Taylor *Decision*

As the Department indicated, the *Taylor* decision involved only physical abuse, specifically where a father intentionally kicked a foot stool in anger, which unintentionally struck his daughter in the face. *Taylor*, 384 Md. at 217. The Harford County Department of Social Services found the father responsible for indicated child physical abuse, and an ALJ upheld the decision. *Id.* at 215.

The case required the Court of Appeals to address an earlier version of statutory definition of "ruled out" child abuse. *See id.* at 223-26. In relevant part, the previous version of COMAR 07.02.07.12(C) provided:

> C. Ruled Out Child Abuse. A finding of ruled out child abuse is appropriate if child abuse did not occur. A finding of ruled out may be based on credible evidence that:
>
> (1) There was no physical or mental injury or, in the case of suspected sexual abuse, no sexual molestation or exploitation;
>
> (2) In the case of physical abuse:
>
> (a) The alleged abuser was not responsible for the injury for reasons including, but not limited to, one of the following:
>
> **(i) The act causing the injury was accidental or unintentional and not reckless or deliberate[.]**
>
> ***

COMAR 07.02.07.12(C) (2004) (emphasis added). As stated above, subparagraph 2(a)(i) currently reads: "The contact with the child was accidental and unintended and under the circumstances, the injury was not foreseeable[.]" COMAR 07.02.07.12(C)(2)(a)(i).

25

Getting ahead of the agency, the ALJ in *Taylor* applied a foreseeability standard and concluded that "physical abuse had occurred because appellant had intentionally kicked the footstool and that under a foreseeability analysis that intent to kick the footstool was the equivalent of an intention to injure and thus met the 'intent' standard of the statute and regulation." 384 Md. at 216. Based on the then-existing language of COMAR 07.02.07.12(C)(2)(a)(i), the Court of Appeals held that the ALJ should have applied a recklessness standard, instead of a foreseeability standard, to determine whether the father's unintended injury of his child constituted indicated physical abuse. *Id*. at 232-33.

Although the *Taylor* Court's holding was limited to the determination of "ruled out" physical abuse, the language of the decision suggested a much broader application. Appellant claims that the language of *Taylor* requires a finding of intent or recklessness for all child abuse. Appellant relies on the following passage from *Taylor*:

> The threshold question that must be determined in a case such as this is whether the **act causing injury to a child was done with an intent to injure or was done recklessly and injury resulted.** In the case *sub judice,* intent is relevant only insofar as determining whether there was an intent actually to injure the child.
>
> \*\*\*
>
> Furthermore, if we were to abide by the methodology by which the ALJ interpreted § 5-701 of the Family Law Article and the pertinent COMAR regulations, **it appears that *any* intentional act by a parent or caretaker which has the unintentional consequence of harming that person's child would amount to child abuse, and result in the parent being placed on the central registry of individuals responsible for child abuse, basically creating a strict liability standard for parents or caretakers who unintentionally**

26

**injure their children. . . . We doubt that either § 5-701 of the Family Law Article or COMAR 07.02.07.12 intends for such a draconian strict liability standard always to attach to the intentional acts of parents or caretakers who unintentionally injure their children.**

*Id.* at 230-31 (bold emphasis added).

Although in the cited passage above the Court of Appeals does not expressly limit the application of a scienter requirement to physical abuse, we refuse to read a scienter requirement into mental abuse where the statute and regulations are silent.[8] The *Taylor*

---

[8] It instructive to note that physical abuse cannot occur unless the child bears the brunt of the parent's force, whether the parent intended to strike the child, (a purposeful smack to the head), or not, (a collision with a poorly kicked footstool). The regulations concerning child abuse by mental injury, however, clearly contemplate mental injury being caused by actions *not* directed at the child:

> (2) If an investigation of abuse or neglect suggests issues relating to a child's emotional or psychological well-being, a separate investigation of mental injury may be conducted after consideration of any of the following:
>
> (a) Implied or overt threat of death or serious injury to the child **or other individuals**;
>
> (b) Implied or overt threat in the form **of pet or animal torture**;
>
> (c) Constant denigration of the child;
>
> (d) Extensive emotional or physical isolation or confinement of the child; or
>
> (e) **Domestic violence in the home**.

COMAR 07.02.07.08(C)(2) (emphasis added).

Court's admonition against strict liability is strong, but cannot compel this court to usurp the role of the legislature or agency and write in a crucial element of the law that does not exist. *See Toler*, 373 Md. at 223-24. The ALJ therefore did not err by failing to include scienter as an element of indicated child abuse by mental injury.

## II. Privilege

Appellant contends that the ALJ erred by allowing McCarthy, Dr. Munson, and Zuksin to testify about their communications with Hershey, the social worker who provided therapy to both Raven and appellant. Appellant contends that her communications with Hershey, as well as those of Raven, are privileged under Maryland Code (2006, 2013 Repl. Vol.), § 9-121 of the Courts & Judicial Proceedings Article (II) ("CJ"). Because Hershey is licensed in Pennsylvania, where the therapy took place, appellant also contends that Pennsylvania privilege law prohibits the disclosure of her family's therapy sessions with Hershey. Appellant argues that the ALJ summarily denied her privilege assertion without conducting the necessary inquiry into the existence and coverage of the privilege.

The Department responds that the social-worker privilege does not apply to Hershey because CJ § 9-121 applies to individuals "licensed as certified social worker[s] under [Maryland] Title 19 of the Health Occupations Article" and appellant failed to establish that Hershey was licensed anywhere other than Pennsylvania. The Department also contends that no Pennsylvania privilege would apply, and even if such privilege did apply, there is an exception for the disclosure of Hershey's opinions and reports for the purpose of any child

28

abuse proceeding.

Appellant's argument is not preserved for our review, because she failed to raise before the ALJ any privilege under Maryland or Pennsylvania law.[9] When appellant objected to testimony from McCarthy regarding his conversations with Hershey and the use of her report, appellant did not assert any privilege. Instead, appellant referenced the fact that communications with Hershey had been deemed privileged in the collateral child custody proceeding. Because Raven had not waived her privilege in that proceeding, appellant expressed concern that she would not be able to call Hershey as witness, and thus her ability to rebut McCarthy's testimony would be undermined. The colloquy read as follows:

| [DEPARTMENT]: | All right. Did you ever speak to Raven's therapist? |
|---|---|
| [MCCARTHY]: | I did. I also obtained a written statement of her -- summarizing her work with Raven up until that time, which was December 2010. |
| [DEPARTMENT]: | And what did she state? |
| [APPELLANT'S COUNSEL]: | Your Honor, I'd like to object to this, and here's why. **In the collateral civil custody case, the best interest attorney for Raven did not waive Raven's privilege. And at that lawyer's direction, no evidence was therefore** |

---

[9] Appellant also failed to establish that Hershey was a licensed social worker in Maryland. Thus Maryland Code (2006, 2013 Repl. Vol.), § 9-121 of the Courts & Judicial Proceedings Article (II) does not apply.

29

**permitted as to what Raven's therapist said or didn't say, what findings she made or didn't make.**

So, I'd ask that since we can't -- even if we had been inclined to subpoena Raven's therapist, the best interest attorney would not permit that. **And so, the therapist would have effectually come here and said, I can't testify because I'm under -- I'm under an assertion of privilege by the child's agent, the best interest attorney.**

**This isn't evidence we would even be able to rebut.** It just -- if it comes in, sadly, it'll just come in. And I don't think it's even appropriate for it to come in. I haven't talked to Ms. Sadikian (phonetic), the attorney for the child in that other case. But that's my motion, Your Honor.

[ALJ]:                Do you want to respond?

[DEPARTMENT]    **I believe it would come in under the hearsay [rules]. And this -- I know that custody is a totally different animal.** And it was part of his notes and part of the investigation in collateral who he talked to and what they said.

[JUDGE]:            I'm going to overrule the objection. You can go ahead.

                              ***

[MCCARTHY]:      Well, I had a brief telephone conversation with her, and I summarized -- what I just read is my summary of what

30

|  |  |
|---|---|
|  | she told me. And she followed that up with a written summary, which is contained in the record. |
| [APPELLANT'S COUNSEL] | Your Honor, I'm going to respectfully not continue to make this objection over and over again. I would like -- Your Honor's overruled my objection. **I would like leave in light of that to bring Amy Hershey.** Maybe just leave that one issue open for her testimony, because, again, we've been -- |
| [JUDGE]: | Okay. Well, we'll get to that . . . in your case. |

No specific privilege applicable to the instant case was ever mentioned, and appellant even suggested calling Hershey during her own case. In addition, appellant did not object to the admission of the reports of McCarthy, Dr. Munson and Zuskin, all of which incorporated their communications with Hershey.

In sum, appellant failed to assert any privilege during the administrative proceeding as she was required to do. *See, e.g.*, *Catler v. Arent Fox, LLP*, 212 Md. App. 685, 702-03, *cert. denied*, 435 Md. 502 (2013) (concluding that in the context of attorney-client privilege, it is well-established that the burden of establishing the privilege is on the party asserting the privilege). Instead, her counsel relied on the failure to waive Raven's privilege in the civil custody matter. Thus we conclude that the privilege issue was not preserved for appellate review. *See Delmarva Power & Light Co.*, 370 Md. at 32.

### III. Immunity

Finally, appellant claims that she should be granted immunity, because she was required to report child abuse to the Department. Again, appellant failed to raise such issue before the ALJ. Appellant claims, nevertheless, that the issue has been preserved under *Motor Vehicle Administration v. Lytle*, because the claim is "expressly encompassed in the final decision of the ALJ." 374 Md. 37, 55 (2003) (internal quotation marks omitted).

An issue can be preserved without having been previously raised if the resolution of that issue is integral to the legal determination of the case. *Eng'g Mgmt. Servs., Inc. v. Md. State Highway Admin.*, 375 Md. 211, 235 (2003). A legal defense, such as immunity, that does not appear in the statute or in the implementing regulations does not qualify as integral and can be waived. Thus appellant's immunity claim has not been preserved.

For the reasons set forth above, we uphold the decision of the ALJ that appellant was responsible for child abuse by mental injury.

**JUDGMENT OF THE CIRCUIT COURT FOR WASHINGTON COUNTY AFFIRMED; APPELLANT TO PAY COSTS.**