*Lauren McClanahan v. Washington County Department of Social Services*, No. 79, September Term, 2014, Opinion by Adkins, J.

**MARYLAND CODE (1984, 2012 REPL. VOL.), § 5-701 OF THE FAMILY LAW ARTICLE ("FL") — CHILD ABUSE MENTAL INJURY — STATUTORY CONSTRUCTION:** Considering § 5-701 of the Family Law Article and *Taylor v. Harford County Department of Social Services*, we hold that a person can only be identified on a central registry as responsible for child abuse if the person intended to injure the child or acted with reckless disregard of the child's welfare.

Circuit Court for Washington County
Case No.: 21-C-11-42484-AA
Argued: September 9, 2015

IN THE COURT OF APPEALS

OF MARYLAND

No. 79

September Term, 2014

LAUREN McCLANAHAN

v.

WASHINGTON COUNTY DEPARTMENT
OF SOCIAL SERVICES

Barbera, C.J.
Battaglia
Greene
Adkins
McDonald
Watts
Harrell, Glenn T., Jr. (Retired,
    Specially Assigned),

JJ.

Opinion by Adkins, J.
Battaglia and McDonald, JJ., dissent.

Filed: December 22, 2015

An Administrative Law Judge found that Lauren McClanahan ("Mother") was responsible for child abuse and could be placed on the "central registry" maintained by the Department of Human Resources ("DHR"). This finding was based on Mother taking her child to health providers on multiple occasions after the child complained that her father had hurt her, and the child exhibited vaginal redness. Our decision hinges on the role of scienter in such a proceeding.

## FACTS AND LEGAL PROCEEDINGS

In 2010 the Washington County Department of Social Services ("the Department") conducted investigations of Mother's alleged abuse and neglect of her daughter ("R").[1] The investigations were triggered by multiple allegations by R that her biological father (Mother's ex-husband) had sexually abused her when she visited him.[2] Mother reported these allegations at various medical facilities, where R was subjected to eight vaginal exams[3] over the course of several years.[4] These exams showed evidence of vaginal redness

---

[1] Specifically, the Department opened the child abuse investigation after receiving several reports that R had said that her father had sexually abused her. The Department's child neglect investigation was triggered by a report the Department received the next month when Mother alleged at a medical facility that R said that her father had touched her.

[2] Mother and her ex-husband share joint legal custody of R, who was born in 2005.

[3] Some of these vaginal exams were SAFE exams. SAFE is an acronym for a sexual assault forensic examination. *See Cooper v. State*, 434 Md. 209, 215–16, 73 A.3d 1108, 1112 (2013); *Jones-Harris v. State*, 179 Md. App. 72, 80 n.4, 943 A.2d 1272, 1276 n.4 (2008).

[4] The ALJ found that the Department conducted approximately 14 sexual abuse investigations of R's father before it investigated Mother for alleged abuse and neglect.

or discharge, not sexual abuse. Those who examined R, however, could not fully discount her allegation that her father had "hurt her bottom." As one medical professional noted, a normal exam does not exclude sexual assault.

R received a ninth vaginal exam at a pediatric practice. Mother took R in because of a cough and an injury. When R reported that her father hurt her "bottom," a physician assistant examined her vaginal area. The assistant referred Mother to a medical facility equipped to further evaluate R. But at the Department's request,[5] that facility refused to conduct a SAFE exam on R. This is the only evidence that a medical professional refused to examine R out of concern for her mental health. Mother testified that since then, R made more allegations of abuse against her father, but that she was afraid to take her to a doctor.

The Department asked two experts in clinical child welfare, Dr. Carlton E. Munson ("Munson") and Ronald E. Zuskin, LCSW-C[6] ("Zuskin"), to assess R.[7] Munson and Zuskin diagnosed R as suffering from several mental disorders and identified Mother as the cause of R's mental injury.

---

Although the record is unclear as to whether each vaginal exam triggered a sexual abuse allegation, the exams triggered sexual abuse investigations on at least several occasions.

[5] The Department had, at this time, commenced the child abuse and neglect investigations.

[6] LCSW-C means Licensed Certified Social Worker-Clinical.

[7] A complete investigation of child abuse mental injury requires assessment by two licensed physicians, psychologists, or social workers. Code of Maryland Regulations ("COMAR") 07.02.07.09B.

After conducting its investigations, the Department notified Mother that it found her responsible for indicated child abuse mental injury and indicated child neglect. Exercising her right of appeal under Md. Code (1984, 2012 Repl. Vol.), § 5-706.1(b) of the Family Law Article ("FL"), Mother requested contested case hearings through the Office of Administrative Hearings to challenge both findings. The Administrative Law Judge ("ALJ") who was assigned to Mother's appeal held a hearing for both cases in 2011.

In its decision, the ALJ affirmed the Department's finding of indicated child abuse mental injury. Relying heavily on Munson's and Zuskin's assessments, the ALJ concluded that Mother's actions "were either an intentional attempt to manipulate and influence the outcome of an ongoing custody dispute with R[]'s father, or were a result of her subconscious efforts to have R[] remain close to her."

Munson concluded that Mother had caused R's mental injury by "engaging in conscious or unconscious suggestive utterances to R[] about abuse by the father and engaging in alienating activities related to the father." Munson also explained that R suffered emotional and behavioral problems because of Mother's "frequent abuse allegations," which "resulted in repeated exams and investigations." Zuskin reached similar conclusions. Although Zuskin did not state that Mother "coached" R to make false abuse allegations, he believed that Mother reinforced her daughter's behavior by responding to R's statements of abuse with "animal protectiveness and closeness." Munson and Zuskin contacted Amy Hershey, a licensed social worker who counseled R and incorporated their communications with her into their assessments of R.

3

The ALJ rejected Mother's argument that she had acted reasonably, ruling that no medical evidence justified the repeated allegations Mother and R had made. The ALJ authorized the Department to identify Mother in a central registry[8] as being responsible for child abuse mental injury.

The ALJ, however, modified the Department's finding of indicated child neglect to "ruled out child neglect." The ALJ reasoned that because Mother's acts already constituted child abuse mental injury, that same conduct could not constitute child neglect mental injury. The Department did not appeal this ruling.

Mother appealed the ALJ's decision to the Circuit Court for Washington County as provided by Md. Code (1984, 2014 Repl. Vol.), § 10-222(a) of the State Government Article ("SG"). Affirming the ALJ's decision, the Circuit Court concluded that Hershey's statements were not privileged and that the ALJ did not err in permitting Munson and Zuskin from relying on communications with and a report from Hershey. The court also found that Mother had failed to preserve her arguments that she was immune from liability by making a good faith report of child abuse, that Munson and Zuskin were not qualified as experts, and that Munson's and Zuskin's testimony was inadmissible. Finally, the Circuit Court rejected Mother's argument that a finding of indicated child abuse mental injury requires proof of intent.

---

[8] Although COMAR 07.02.07.02B(5) still refers to the database containing information regarding child abuse investigations as the "central registry," the General Assembly amended FL § 5-701 in 2015 and renamed the central registry, which is now known as the "centralized confidential database." *See* Md. Code (1984, 2012 Repl. Vol.), § 5-701(d) of the Family Law Article ("FL"); *see also* FL § 5-714.

4

In a reported opinion, the Court of Special Appeals affirmed the judgment of the Circuit Court. *McClanahan v. Washington Cnty. Dep't of Soc. Servs.*, 218 Md. App. 258, 96 A.3d 917 (2014), *cert. granted*, 440 Md. 461, 103 A.3d 593 (2014). In relevant part, the intermediate appellate court concluded that the ALJ did not err by failing to include scienter as an element of indicated child abuse mental injury. *Id.* at 277–83, 96 A.3d at 928–31. The court also concluded that Mother had failed to preserve the privilege and immunity issues. *Id.* at 283–86, 96 A.3d at 931–33.

We granted Mother's Petition for Writ of Certiorari to consider the following questions:

> 1. Does the Court of Special Appeals['] decision that a parent can be strictly liable for child abuse by mental injury by seeking medical help for her five year old based on the child's disclosures and symptoms, absent any finding that the parent acted intentionally, recklessly, or in bad faith to cause injury, violate the Due Process Clause, Family Law Article §§ 5-701 *et seq.*, and *Taylor v. Harford County Department of Social Services*, 384 Md. 213[, 862 A.2d 1026] (2004)?
>
> 2. Did Petitioner's attorney waive Petitioner's objections to the privileged testimony of a therapist by discussing the assertion of privilege by the child's attorney in the collateral child custody proceeding?
>
> 3. Did the ALJ's decision against Petitioner violate the immunity provisions of Family Law Article § 5-708 and [Md. Code (1973, 2013 Repl. Vol.), § 5-620 of the] Courts and Judicial Proceedings Article []?

Because we answer yes to the first question (in part), we need not address the other questions. We shall reverse the judgment of the Court of Special Appeals and remand for further proceedings.

5

**STANDARD OF REVIEW**

When reviewing an administrative decision, we assume the same role as the Circuit Court and intermediate appellate court, and "'limit our review to the agency's decision.'" *Cosby v. Dep't of Human Res.*, 425 Md. 629, 637, 42 A.3d 596, 601 (2012) (citation omitted).

"[A] challenge to the entry of one's name in a central registry as an 'indicated child abuser' pursuant to [FL] § 5-701 [] is a contested case within the meaning of [SG] § 10-202(d)(1)" in which the agency acts in its quasi-judicial capacity. *Taylor v. Harford Cnty. Dep't of Soc. Servs.*, 384 Md. 213, 221, 862 A.2d 1026, 1030 (2004). In a contested case,[9] when an ALJ[10] affirms a finding that a person is responsible for indicated child abuse, SG § 10-222(h) establishes the standards of review of the agency's decision. *Charles Cnty. Dep't of Soc. Servs. v. Vann*, 382 Md. 286, 295, 855 A.2d 313, 318 (2004); *see* SG § 10-222(a)(1) (A party "aggrieved by the final decision in a contested case" may seek judicial review of that decision.).

If a petitioner challenges the agency's factual determinations, we review whether substantial evidence supports the finding. SG § 10-222(h)(3)(v); *Vann*, 382 Md. at 295, 855 A.2d at 318. When a petitioner challenges how to apply and interpret statutes and

---

[9] *See* FL § 5-706.1(b)(1) (A person "may request a contested case hearing to appeal" a finding of indicated child abuse.).

[10] *See* Md. Code (1984, 2014 Repl. Vol.), § 10-202(b)(1) of the State Government Article ("SG") (An agency is an officer or unit authorized "to adjudicate contested cases."); SG §§ 9-1603, 9-1604 (The Chief ALJ, who heads the Office of Administrative Hearings, assigns ALJs to conduct contested case hearings.).

regulations, we are reviewing a question of law. *Cosby*, 425 Md. at 638, 42 A.3d at 602.

In reviewing legal questions, we accord "some deference" to "an agency's legal interpretation of the statute it administers or of its own regulations." *Taylor*, 384 Md. at 222, 862 A.2d at 1031. Even if we grant some deference to the agency's legal interpretations, we must correct a legal conclusion that is erroneous. *Cosby*, 425 Md. at 639, 42 A.3d at 602.

Mother challenges the intermediate appellate court's conclusion that the ALJ did not err in failing to include scienter as an element of indicated child abuse mental injury. *See McClanahan*, 218 Md. App. at 277–83, 96 A.3d at 928–31. Thus, we review only a legal question.

## DISCUSSION

Our role today is to engage in statutory interpretation as we decide whether a parent can be liable for child abuse mental injury within the meaning of FL § 5-701[11] if the parent acted without intent to harm the child. Mother and the Department dispute the meaning of FL § 5-701, as well as the scope of Code of Maryland Regulations ("COMAR") 07.02.07.12, which directs the dispositions of investigations of suspected child abuse. Mother argues that *Taylor v. Harford County Department of Social Services*, 384 Md. 213, 862 A.2d 1026 (2004), forecloses any finding of indicated child abuse mental injury based on strict liability. She avers that a strict liability standard not only conflicts with *Taylor*, but would undermine other statutes that require reporting of child abuse in the Family Law

---

[11] FL §§ 5-701–5-715 constitute Subtitle 7 (Child Abuse and Neglect) of Title 5 (Children). We shall sometimes refer to these sections collectively as "Subtitle 7."

Article, as well as other pertinent regulations. The Department counters that the statutes and regulations pertaining to child abuse mental injury contain no scienter requirement. The Department dismisses *Taylor* as a case limited to child abuse causing physical injury.

"The cardinal rule of statutory construction is to ascertain and effectuate legislative intent." *Motor Vehicle Admin. v. Shrader*, 324 Md. 454, 462, 597 A.2d 939, 943 (1991). Under the plain meaning rule, we must give the "ordinary and natural meaning" to statutory language because this language is "the primary source of legislative intent." *Id.* "If the intent of the legislature is clear from the words of the statute, our inquiry normally ends and we apply the plain meaning of the statute." *Huffman v. State*, 356 Md. 622, 628, 741 A.2d 1088, 1091 (1999).

Moreover, we should reasonably construe a statute "with reference to the purpose, aim or policy of the legislature reflected in that statute." *Shrader*, 324 Md. at 463, 597 A.2d at 943. "'[R]esults that are unreasonable, illogical or inconsistent with common sense should be avoided whenever possible consistent with the statutory language, with the real legislative intention prevailing over the intention indicated by the literal meaning.'" *Id.* (citations omitted); *see also* 2A Norman J. Singer & Shambie Singer, *Sutherland Statutes and Statutory Construction* § 46:7 (7th ed. 2014).

**Terms of Statutes, Regulations and *Taylor***

The key statutory language is found in the definition of child abuse in FL § 5-701. Abuse means:

> (1) the physical or mental injury of a child by any parent or other person who has permanent or temporary care or custody or responsibility for supervision of a child, or by any household

8

or family member, under circumstances that indicate that the child's health or welfare is harmed or at substantial risk of being harmed . . . .

Additionally, FL § 5-701 defines the three findings that a local department may make after investigating a report of suspected abuse:

> (m) "Indicated" means a finding that there is credible evidence, which has not been satisfactorily refuted, that abuse, neglect, or sexual abuse did occur.

> * * *

> (w) "Ruled out" means a finding that abuse, neglect, or sexual abuse did not occur.

> * * *

> (y) "Unsubstantiated" means a finding that there is an insufficient amount of evidence to support a finding of indicated or ruled out.

FL § 5-707(a)[12] authorizes DHR to "provide by regulation" for "conditions for determining" whether abuse "is indicated, ruled out, or unsubstantiated." COMAR

---

[12] In 1993, the General Assembly authorized the Department of Human Resources ("DHR"), through FL § 5-707(a), to create regulations to establish conditions for determining whether abuse was indicated, unsubstantiated, or ruled out. *See* H.B. 617, 1993 Gen. Assemb. Reg. Sess. (Md. 1993). Then, a Notice of Emergency Action was issued. *See* 20 Md. Reg. 1547 (October 1, 1993). In then-COMAR 07.02.07.08, DHR established criteria for local departments to follow in determining whether to make a finding of indicated, unsubstantiated, or ruled out child abuse. *See id.* at 1549–50. In 1994, DHR repealed and adopted new regulations pertaining to child abuse. *See* 21 Md. Reg. 1235 (July 8, 1994); 21 Md. Reg. 1630 (Sept. 16, 1994). The criteria for the three findings were moved to COMAR 07.02.07.12. 21 Md. Reg. at 1242.

07.02.07.12[13] sets forth the following elements for indicated child abuse regarding physical and mental injuries:

> **A. Indicated Child Abuse.**
> **(1) Physical Abuse Other than Mental Injury.** Except as provided in §A(3) of this regulation, a finding of indicated child physical abuse is appropriate if there is credible evidence, which has not been satisfactorily refuted, that it is more likely than not that the following four elements are present:
> (a) A current or prior physical injury;
> (b) The injury was caused by a parent, caretaker, or household or family member;
> (c) The alleged victim was a child at the time of the incident; and
> (d) The nature, extent, and location of the injury indicate that the child's health or welfare was harmed or was at substantial risk of harm.
>
> * * *
>
> **(3) Abuse-Mental Injury.** A finding of indicated child abuse with mental injury is appropriate if there is credible evidence, which has not been satisfactorily refuted, that the following four elements are present:
> (a) A current or prior mental injury characterized by an observable, identifiable, substantial impairment to the child's mental or psychological ability to function, which may be shown by the need for specific psychiatric, psychological, or social work intervention;
> (b) The mental injury was caused by a parent, a caretaker, or household or family member;
> (c) The alleged victim was a child at the time of the incident; and
> (d) The nature and extent of the mental injury indicate that the child's health or welfare was harmed or was at substantial risk of harm.

---

[13] *See Hranicka v. Chesapeake Surgical, Ltd.*, 443 Md. 289, 298, 116 A.3d 507, 512 (2015) ("When we construe an agency's rule or regulation, 'the principles governing our interpretation of a statute apply[.]'") (citations omitted).

(Emphasis added.) COMAR 07.02.07.12 also sets forth the following pertinent criteria for

ruling out[14] child abuse in cases of physical and mental injuries:

> **C. Ruled Out Child Abuse.** A finding of ruled out child abuse
> is appropriate if child abuse did not occur. A finding of ruled
> out may be based on credible evidence that:
> (1) There was no physical or mental injury . . . .
> **(2) In the case of physical abuse:**
> (a) The alleged abuser was not responsible for the injury for
> reasons including, but not limited to, one of the following:
> (i) The contact with the child was accidental and unintended
> and under the circumstances, the injury was not foreseeable . . . .

(Emphasis added.) We keep FL § 5-701(b), the statutory definition of abuse, in the

forefront of our minds as we construe these regulations and evaluate the actions of Mother.

*See Dep't of Human Res., Balt. City Dep't of Soc. Servs. v. Hayward*, 426 Md. 638, 658,

45 A.3d 224, 236 (2012) (An agency's "authority to promulgate regulations . . . must be

consistent, and not in conflict, with the statute the regulations are intended to implement.

We have consistently held that the statute must control.").

The Department points out that the regulations pertaining to child abuse mental

injury contain no express scienter requirement. *See* COMAR 07.02.07.12A(3)(b). Scienter

only appears in one criterion, namely, to rule out child abuse *physical* injury: "[t]he contact

with the child was accidental and unintended and under the circumstances, the injury was

not foreseeable." COMAR 07.02.07.12C(2)(a)(i). There exist no similar criteria to rule

out child abuse mental injury. COMAR 07.02.07.12C. The Department insists that we

should rely on COMAR 07.02.07.12 to conclude that a parent's mental state is not material

---

[14] Because the parties do not discuss unsubstantiated child abuse, we do not include
that portion of the regulation. *See* COMAR 07.02.07.12B.

11

in a case of child abuse mental injury, citing *Toler v. Motor Vehicle Admin.*, 373 Md. 214, 223–24, 817 A.2d 229, 235 (2003) ("[W]here the legislature has carefully employed a term in one place and excluded it in another, it should not be implied where excluded.").

We reject the Department's argument because the statute itself fails to draw any distinction between physical and mental injury to a child. Without statutory directive, there is no reason why scienter should be required in one instance (physical), and not the other (mental). *See Hayward*, 426 Md. at 658, 45 A.3d at 236. Our decision in *Taylor* is instructive on how to interpret this statute. As the Department underscores, *Taylor* involved a physical injury and our holding addressed that. But a mental injury can be accidental to the same extent as a physical one. Moreover, a study of *Taylor* reveals that our concerns about "strict liability" stemmed in part from the statute, which treats "mental" and "physical" injury identically in the definition of abuse.

In *Taylor*, an investigator for the local department made a finding of indicated child abuse where the father, acting in anger, kicked a footstool that collided with his daughter. 384 Md. at 216–18, 862 A.2d at 1027–28. On appeal, the ALJ agreed with the local department that "it is immaterial whether the [father] intended to hit [his daughter]." *Id.* at 219, 862 A.2d at 1029 (italics omitted). The ALJ reasoned that FL § 5-701 includes no scienter element in the definition of abuse. *Id.* at 220, 862 A.2d at 1029. In the ALJ's view, COMAR 07.02.07.12 also did not allow the father to avoid "responsibility for the unintended but foreseeable consequences of his intended act." *Id.* We held that the ALJ committed reversible error by failing to consider COMAR 07.02.07.12C(2)(a)(i), an explicit criterion for ruling out child abuse physical injury if the "act causing the injury was

12

accidental or unintentional and not reckless or deliberate." *See id.* at 226, 231, 862 A.2d at 1033, 1036. Notably, we did not stop there.

We further explained that the ALJ's reasoning was flawed because it could extend to "*any* intentional act by a parent or caretaker which has the unintentional consequence of harming that person's child." *Id.* at 231, 862 A.2d at 1036 (emphasis in original). We were skeptical that "*either* § 5-701 of the Family Law Article or COMAR 07.02.07.12 intend[ed] for such a draconian strict liability standard always to attach to the intentional acts of parents or caretakers who unintentionally injure their children." *Id.* at 231–32, 862 A.2d at 1036–37 (emphasis added). In other words, we did not limit our concern about a strict liability standard to acts causing physical injury, as COMAR 07.02.07.12 did.

We see no reason to do so now. When expert witnesses testify that a parental action has caused mental injury to a child, the parent's action must be examined in context. As we concluded in *Taylor*, "*it is material* whether there was 'intent' to injure [the child]."[15] *Id.* at 233, 862 A.2d at 1037 (emphasis in original). Because FL § 5-701(b) does not differentiate between mental injury and physical injury, we do not interpret Subtitle 7 to sanction a regulation in which a parent can be deemed a child abuser for unintentionally

---

[15] Following *Taylor*, DHR adopted an amendment to COMAR 07.02.07.12C(2)(a)(i), the criterion for ruled out child abuse physical injury, which reflected our reasoning in this decision. 34 Md. Reg. 2025 (November 9, 2007) ("The change is made to restate the language more clearly, consistent with [*Taylor*]."). This criterion previously ruled out child abuse physical injury when the act was unintentional. *See Taylor v. Harford Cnty. Dep't of Soc. Servs.*, 384 Md. 213, 226, 862 A.2d 1026, 1033 (2004). Now the amended criterion rules out such injury if the contact is unintended. COMAR 07.02.07.12C(2)(a)(i). The criterion properly considers intent to harm.

causing mental injury but not liable for unintentionally causing physical injury.[16] The

Department offers no reasonable explanation for that distinction.

In light of our discussion of *Taylor,* we are similarly unpersuaded by the

Department's argument that FL § 5-701 excludes any consideration of scienter for mental

injury because it contains no express scienter requirement. FL § 5-701 contains no express

scienter requirement for physical injury either. Under the Department's theory, then, DHR

would have no authority in the first place to exclude accidental physical injuries in

COMAR 07.02.07.12. But that theory does not square with *Taylor.* The Department has

avoided explaining the central problem in this case: the regulation excludes accidental

physical injury but includes accidental mental injury, a distinction FL § 5-701 does not

make.

To be sure, there may be examples of mental injury arising from parental conduct

that are so reprehensible that an ALJ might infer intent to harm or reckless disregard just

from the act. One family law scholar has discussed classic examples of such conduct in

the following manner:

> What does emotional abuse and neglect look like? Elle's case
> is one example. The "Cinderella syndrome" is another
> common form of emotional abuse. In these cases, parents
> designate one child as a scapegoat. They require her to do
> more household tasks than their other children and do not give
> her the same privileges and opportunities as they do the other
> children. Both methods of abuse include ignoring, rejecting,

---

[16] For example, a parent is not an abuser if she pushes a non-athletic child to participate in a sports program, thereby causing depression or a sense of inferiority if the child is unsuccessful. Likewise, a parent is not an abuser if he makes a decision to move to a different state and causes a child to become depressed from loss of friends and family.

and isolating a child, which typically causes depression and low self-esteem.[17]

The nature of the conduct in this case is patently different.  We are faced with parental conduct that is ostensibly for a child's protection.

---

[17] Jessica Dixon Weaver, *The Principle of Subsidiarity Applied: Reforming the Legal Framework to Capture the Psychological Abuse of Children*, 18 Va. J. Soc. Pol'y & L. 247, 250 (2011).  Weaver described "Elle's" situation:

> "Elle" is a thirteen-year-old only child who is constantly left at the library past closing time.  She is restricted from eating outside of set mealtimes by a lock and chains on the refrigerator door.  Fed mostly hotdogs and other junk food, she hoards food from outside the home in her room, which is a mess.  When she gets into fights with her mother, she usually winds up in a psychiatric facility for children.  Her mother complained about her tantrums to the police the first ten times she called them out to her home.  Elle is placed on three different types of psychotropic medication, which affect her ability to learn in school.  By the eleventh phone call, the facility refuses to take Elle because she does not need their services. . . . Though library personnel and teachers at Elle's school have been concerned about her, nothing *that* bad appears to be going on at home.  After all, her mother is a well-respected schoolteacher.
> . . . [Although initially nonresponsive], [a]fter a few visits, she eventually shares that her mother often told her "I hate you" and locked her in her room for hours.  She tells us that she did not want to talk with or visit with her mother again.  Neighbors later tell CPS, after she is removed, that Elle's mother was verbally abusive and often kicked Elle out of the house late in the evening without food when she was upset with her.

*Id.* at 248–49 (emphasis in original) (footnote call number omitted).  Weaver also cites domestic violence in the child's presence, and living with a drug-addicted parent as actions giving rise to emotionally abused children.  *See id.* at 259.

Indeed, the Department's view would undermine the paramount statutory purpose of Subtitle 7—child protection. *See* FL § 5-702. *Amici curiae*[18] help elucidate why. A parent who in good faith reports suspected child abuse and seeks a SAFE exam can be a critical "protector and advocate" of that child. Brief of Child Justice, Inc., et al. as *Amici Curiae* in Support of Mother, at 5. If we read the statutory and regulatory scheme as the Department does, however, the parent faces potential inclusion on the central registry merely by reporting. Thus the parent receives a badge of dishonor even if she had no intent to harm the child. The parent must now consider her "own interests and potential liability before" her child's welfare. *Id.* at 6. And if the reporting parent is penalized, then that parent has a disincentive to report future abuse. The child, then, will lose the effective protection and advocacy her parent can provide through reporting. *Id.* at 5. Indubitably, Subtitle 7 of the Family Law Article was not designed to dissuade parents from reporting allegations of child abuse. *See id.* at 8, 9. For these reasons, we conclude that the Department interprets the child abuse statutory scheme in a manner that is "'unreasonable, illogical [and] inconsistent with common sense.'"[19] *Shrader*, 324 Md. at 463, 597 A.2d at 943 (citations omitted).

---

[18] *Amici* are non-profit organizations that advocate for abused children. Brief of Child Justice, Inc., et al. as *Amici Curiae* in Support of Mother, at 1, 5–8.

[19] We rest our decision on statutory interpretation, rather than Mother's argument that, without proof of intent or reckless disregard, the Department's interpretation of Subtitle 7 would be unconstitutional under *Troxel v. Granville*, 530 U.S. 57 (2000) and *Koshko v. Haining*, 398 Md. 404, 921 A.2d 171 (2007).

We are well aware that "courts should generally defer to agencies' decisions in promulgating new regulations because they presumably make rules based upon their expertise in a particular field." *Fogle v. H & G Rest., Inc.*, 337 Md. 441, 455, 654 A.2d 449, 456 (1995). We will not, however, give effect to agency regulations that are inconsistent with or conflict with "the statute the regulations are intended to implement." *Hayward*, 426 Md. at 658, 668, 45 A.3d at 236, 242. "[R]ules and regulations adopted by an administrative agency must be reasonable and consistent with the letter and spirit of the statute under which the agency acts." *Paek v. Prince George's Cnty. Bd. of License Comm'rs*, 381 Md. 583, 591, 851 A.2d 540, 544 (2004) (citations and internal quotation marks omitted); *Lussier v. Md. Racing Comm'n*, 343 Md. 681, 687, 684 A.2d 804, 806–07 (1996).

We have previously refused to give effect to other DHR regulations on grounds they were inconsistent with provisions of the Family Law Article pertaining to child abuse. In *Department of Human Resources, Baltimore City Department of Social Services v. Hayward*, we addressed the appeal rights of a person subject to a child abuse investigation after a local department makes a finding of unsubstantiated child abuse, and held that such person has a right to appeal that finding (with a goal of securing a "ruled out" decision). 426 Md. at 642, 662–69, 45 A.3d at 226, 238–43. We rejected the Department's effort to foreclose any appeal from such finding because the Department relied on its own regulations that were inconsistent with the applicable statute. *Id.* at 659, 45 A.3d at 236.

*Hayward* involved FL § 5-706.1, which created a right to a conference and a right to appeal for persons challenging findings of unsubstantiated child abuse. *Id.* at 660, 45

17

A.3d at 237. But COMAR 07.02.26.05B limited the right to appeal to "[a]n individual *found responsible* for unsubstantiated child abuse." *Id.* (emphasis in original). We explained that the regulation conflicted with the statutory language because "the statute [did] not differentiate between individuals who are found responsible for 'unsubstantiated' child abuse, and those who are not." *Id.* Because the regulations conflicted with the statute, we refused to "give effect to those regulations" and concluded that "the statute must control."[20] *Id.* at 668, 45 A.3d at 242. *Hayward* is closely analogous to the present case because here we also have a regulation that distinguishes between purported child abusers in a manner the statute does not. COMAR 07.02.07.12 sets different standards for child abusers causing physical and mental injuries. FL § 5-701(b) does not.

Our decision is also informed by a case from our intermediate appellate court. In *Fields v. Department of Human Resources Howard County Department of Social Services*,

---

[20] For other cases where regulations were unenforceable because they violated statutes, see *Mayor & City Council of Balt. v. William E. Koons, Inc.*, 270 Md. 231, 237, 310 A.2d 813, 817 (1973) ("The Committee may not prohibit by regulation that which is permitted by the Housing Code."); *Comptroller of Treasury v. M.E. Rockhill, Inc.*, 205 Md. 226, 234–35, 107 A.2d 93, 98 (1954) (finding Treasury regulation invalid "because the rule would then conflict with the statute"); *cf. State Farm Mut. Auto. Ins. Co. v. Md. Auto. Ins. Fund*, 277 Md. 602, 605–06, 356 A.2d 560, 562 (1976) (rejecting Insurance Commissioner's approval of an insurance policy endorsement because "the endorsement so clearly limits coverage in violation of a statute."). The Court of Special Appeals has also refused to apply regulations that are inconsistent with a statute. *See Md. Dep't of Health & Mental Hygiene v. Brown*, 177 Md. App. 440, 466, 935 A.2d 1128, 1143 (2007) ("[T]o the extent that [the statute] differs from COMAR 10.09.10.01B(31), it controls over the regulation."); *United Parcel Serv., Inc. v. Comptroller of Treasury*, 69 Md. App. 458, 473, 518 A.2d 164, 172 (1986) (In establishing a regulation at issue, "the Comptroller has overridden the plain meaning of the statute. Accordingly, [the regulation] should not be followed."); *Comptroller of Treasury v. Crown Cent. Petroleum Corp.*, 52 Md. App. 581, 591–97, 451 A.2d 347, 352–55 (1982) (concluding Comptroller exceeded his statutory authority in creating the regulations at issue).

also involving child abuse, the applicable statute required an individual contesting a finding of indicated child abuse to respond "to the notice of the local department in writing within 60 days." 176 Md. App. 152, 156, 932 A.2d 824, 827 (2007) (italics omitted). The corresponding regulation, however, imposed a requirement on the individual to respond twice: (1) to request an appeal form and (2) return the appeal form within 60 days of the issuance of notice. *Id.* at 157–58, 932 A.2d at 827–28. The intermediate appellate court ruled that the regulation "exceed[ed] the scope of what [the statute] permitted." *Id.* at 160, 932 A.2d at 829.[21] The court held that COMAR 07.02.26.05 was "not consistent with the letter or spirit of [FL § 5-706.1]." *Id.* at 162, 932 A.2d at 830. By the same token, COMAR 07.02.07.12 is not consistent with FL § 5-701.

Accordingly, we decline to enforce the portion of COMAR 07.02.07.12C that limits its exculpatory scope (for accidental injury) to alleged abusers causing physical injury. FL § 5-706 does not justify such distinction. This means, then, that to be included as a "child abuser" in DHR's central registry, a person must either intend to injure the child or at least act in reckless disregard of the child's welfare. This intent/reckless disregard standard meets that established by DHR for physical injuries and utilized by the *Taylor* Court. We reverse the holding of the Court of Special Appeals that a person can be listed

---

[21] *See also Cecil Cnty. Dep't of Soc. Servs. v. Russell*, 159 Md. App. 594, 607–11, 861 A.2d 92, 100–02 (2004) (holding that the Department should have turned over an audio tape to the respondent before administrative hearing, notwithstanding Department's argument that COMAR 07.02.26.02(B)(18) did not require production of the tape, because the broadly defined language of FL § 5-701(t) required such production); *Prince George's Cnty. Dep't of Soc. Servs. v. Knight*, 158 Md. App. 130, 138–40, 854 A.2d 907, 911–13 (2004) (holding COMAR 07.02.26.05 invalid because, among other things, it conflicted with FL § 5-706.1(b)).

19

on the central registry for actions causing mental injury to a child without intent to harm the child or reckless disregard of the child's welfare.

### The Reckless Disregard Standard and Mother's Intent

The ALJ concluded that Mother's actions were "either an intentional attempt to manipulate and influence" the custody dispute over R "or were a result of her subconscious efforts to have R[] remain close to her." The standard we have adopted does not permit inclusion of a parent's name in the central registry as a child abuser if the parent's inappropriate motivations for reporting child abuse were only at the subconscious level, even if the child was mentally injured. A standard of liability reaching the subconscious level veers much too close to strict liability for parental decisions. *See Taylor*, 384 Md. at 231, 862 A.2d at 1036.

Even if Mother intended to gain an advantage in the ongoing custody battle, inclusion on the central registry as a child abuser is not permitted unless Mother intended to harm R or acted in reckless disregard of R's welfare. Acting with intent or reckless disregard is the standard we required the ALJ to apply in *Taylor*, and was, at the time, adopted by DHR with respect to physical injuries.[22] *See id.* at 225–26, 862 A.2d at 1033 (quoting COMAR 07.02.07.12C(2)(a)(i) effective in 2004, wherein physical abuse was

---

[22] The Department modified its regulation after *Taylor* to say: "The contact with the child was accidental and unintended and under the circumstances, the injury was not foreseeable . . . ." 34 Md. Reg. 2025 (Nov. 9, 2007). We rejected use of foreseeability as the proper standard in *Taylor*, casting it as inappropriate "because foreseeability, even in a tort context, is an appropriate precursor to a finding of negligence, not to a finding of intent." *Taylor*, 384 Md. at 230, 862 A.2d at 1035.

ruled out when "[t]he act causing the injury was accidental or unintentional and not reckless or deliberate").[23]

In a case where the alleged abuser's conduct falls within the realm of conduct that could benefit the child, as medical treatment does, there must be some evidence that supports a conclusion that the parent was at least reckless vis-à-vis the child's health. In other words, a parent's conduct must constitute a gross departure from the type of conduct a reasonable person would engage in under the circumstances. *Cf. Jones v. State*, 357 Md. 408, 430, 745 A.2d 396, 408 (2000) ("The test that we use to determine if a defendant's conduct was reckless is whether the conduct, viewed objectively, constitutes a gross departure from the type of conduct that an [*sic*] law-abiding citizen would observe under similar circumstances.").

## CONCLUSION

Accordingly, we reverse the Court of Special Appeals and remand these proceedings to the ALJ to make factual findings and conclusions of law, consistent with this Opinion.[24]

> **JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. CASE REMANDED TO THAT COURT WITH DIRECTIONS TO REVERSE THE JUDGMENT OF THE CIRCUIT COURT OF WASHINGTON COUNTY, AND DIRECT THAT COURT TO REVERSE**

---

[23] A case involving excessive medical visits/exams is a far cry from Elle and the "Cinderella" syndrome. *See* Weaver, *supra*, at 248–50.

[24] If there is a finding on remand adverse to Mother, we might address the second and third questions presented if the case reaches us again.

**THE DECISION OF THE ADMINISTRATIVE LAW JUDGE, AND REMAND THE CASE TO THE OFFICE OF ADMINISTRATIVE HEARINGS FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS IN THIS COURT AND THE COURT OF SPECIAL APPEALS TO BE PAID BY RESPONDENT.**

Circuit Court for Washington County,
Maryland
Case No. 21-C-11-42484AA
Argued: September 9, 2015

IN THE COURT OF APPEALS
OF MARYLAND

No. 79

September Term, 2014

LAUREN MCCLANAHAN

v.

WASHINGTON COUNTY
DEPARTMENT OF SOCIAL
SERVICES

Barbera, C.J.
Battaglia
Greene
Adkins
McDonald
Watts
Harrell, Jr., Glenn T.
(Retired, Specially
Assigned)

JJ.

Dissenting Opinion by Battaglia, J.
which McDonald, J. joins

Filed: December 22, 2015

I respectfully dissent.

The Majority applies the holding of *Taylor v. Harford Cnty. Dep't of Soc. Servs.*, 384 Md. 213, 862 A.2d 1026 (2004), a case involving the physical abuse of a child, to vacate all of the determinations of the administrative law judge ("ALJ"), the Circuit Court, and the Court of Special Appeals and rule that a mother cannot be found to have committed indicated child abuse, mental injury, when she subjected her daughter to repeated invasive sexual examinations as well as investigations by the Washington County Department of Social Services ("the Department").

The following specific findings of the ALJ regarding Ms. McClanahan's behavior toward her daughter ("R"), when her daughter was between the ages of two to five years old, are certainly more graphic than the Majority describes. The ALJ found that Ms. McClanahan took R to the hospital on nine different occasions for Sexual Assault Forensic Examinations ("SAFE") [1] over a three and a half year period:

> 10. The occasions on which the Appellant reported alleged sexual abuse and took R[] to a medical provider for treatment are as follows:

> - On June 7, 2007, the Appellant had taken R[] to the hospital after R[] returned from her father's house with redness and irritation in her vaginal area. The hospital instructed the Appellant to take R[] to the Child Advocacy Center for a SAFE exam. Dr. Ruth Ann Dwyer performed the examination of R[], the results of which were normal. (Dept. 4)
> - On February 21, 2008, the Appellant had taken R[] to the Child Advocacy Center for an examination after R[] had returned from her father's house with her vaginal area red and swollen and she had reported that her father's 8-year-old stepson, Sean, hurt her. Dr. Dwyer performed a SAFE exam of

---

[1] In her findings, the ALJ explained that, "SAFE exams are conducted by doctors who are SAFE trained and when there is a concern of sexual abuse or assault. SAFE exams require retraction of the genitalia and are not routinely conducted on children between two and five years old."

R[] and diagnosed R[] with vulvitis, which is often caused by poor hygiene and is not uncommon in prepubescent children. (Dept. 5)

- On March 23, 2008, the Appellant had taken R[] to the Waynesboro Hospital in Pennsylvania reporting that R[] had stated that her "bottom hurt." She had reported that her father put things in her vagina. R[] reported to the treating physician that a monster came from the cave and touched her. The physician noted that R[]'s vaginal area was red but that her hymen was intact. Pictures of R[]'s vaginal area were taken during the exam. (Dept. 6)
- On April 28, 2008, the Appellant had taken R[] to Washington County Hospital. The Appellant reported that R[] had returned that day from her father's house and had been reporting that "someone hurt her bottom." The Appellant requested that a SAFE be performed on R[]. A SAFE exam was performed, the results of which revealed some redness in the vaginal area. (Dept. 7)
- On May 26, 2008, the Appellant had taken R[] to the Washington County Hospital requesting a sexual assault examination of R[]. The Appellant had reported to a hospital physician that R[] had returned from her father's home that day and reported that her "bottom hurt" and that "Sean had put a lollipop in her bottom." The Appellant also reported that R[] had discharge in her panties earlier that day. (Dept. 8). R[] also volunteered to the doctor that Shawn had put a lollipop in her bottom. (Dept. 8)
- On May 26, 2008, Washington County Hospital performed a SAFE examination on R[] which revealed no indicia of sexual abuse. (Dept. 8)
- On December 6, 2009, the Appellant had taken R[] to the Chambersburg Hospital in Chambersburg, Pennsylvania. R[] had reported that her father hurt her "bottom" and stuck her with a needle there. The Appellant reported that R[]'s vulva was red and swollen. (Dept. 9)
- On December 6, 2009, upon examination of R[], the doctor noted mild erythema and swelling in the inferior vulva; foul discharge present but no other redness. A urianalysis that was requested by the Appellant was unremarkable.
- On June 23, 2010, after R[] returned from a visit with her father, the Appellant took R[] to Chambersburg Hospital emergency room. The Appellant reported that R[] had stated that her father "poked her with a needle in her front bottom." R[] reported to hospital staff that her "front bottom" hurts. (Dept. 10). Upon examination of R[], the physician noted "mild erythema" and "foul-smelling whitish discharge noted on retraction of vulva." R[] was diagnosed with a urinary tract infection at Chambersburg Hospital. Chambersburg Hospital does not perform SAFE exams. (Dept. 10)

- On June 23, 2010, the Appellant took R[] to Washington County Hospital for a SAFE exam. R[] was not cooperative for the exam so the Appellant brought her back to the hospital later that same day for an exam. R[] reported at the hospital that her father "stuck a needle in her front bottom." R[] further reported that her father touched her the previous night. The SAFE examination revealed redness around R[]'s labia majora but no trauma was noted. (Dept. 12)
- On November 17, 2010, the Appellant took R[] to White Oak Pediatric for a cough and injury. After R[] reported that she was there for her "bottom," Jane Shughart, the physician's assistant (PA), examined R[]'s vaginal area. She observed redness in the area with mucus discharge and what appeared to be a black coarse hair. Ms. Shugar referred the Appellant to Emergency Room to do further evaluation. (Appellant 1). The Appellant took R[] to Washington County Hospital where R[] reported that her father "pokes her with a needle and puts cream on her front bottom." The Washington County Hospital physician refused to perform a SAFE exam based on the request of the local department and its report that R[] had undergone numerous previous SAFE exams. (Dept. 13)

The ALJ also found that the Department had "conducted approximately 14 investigations pertaining to R[] and allegations of abuse" and that every investigation of sexual abuse of R by her father had resulted in a ruled out disposition. Further, the ALJ's findings questioned the bases for the numerous examinations and investigations initiated by Ms. McClanahan:

> 20. R[] has not demonstrated sexual behavior symptoms that are typical of a child that has experienced sexual abuse at the level alleged by the Appellant.
> 21. Redness in the vagina area and discharge are not uncommon medical occurrences in children of R[]'s age and are often the result of poor hygiene (Dwyer testimony).
> 22. R[]'s statements of alleged sexual abuse by her father are made to the Appellant upon her return to the Appellant from visits with her father. R[]'s statements to professionals regarding the alleged abuse are most always made in the presence of the Appellant and not followed up on with the professional at a later time.
> 23. R[] has never made a disclosure of sex abuse to CPS workers during any of the investigations. (McCarthy testimony).

3

The ALJ found that R suffered mental injury based upon the reports of Dr. Carlton E. Munson and Mr. Ronald E. Zuskin, but specifically attributed the source of that injury to Ms. McClanahan based on the evaluation provided by Dr. Munson:

27. It is the opinion of Dr. Munson that R[] has been mentally injured and that the source of the injury is the Appellant's engaging in suggestive utterances to R[] about abuse by R[]'s father and engaging in alienating activities related to the father. (Dept. 17, page 21)

28. It is the opinion of Dr. Munson that R[] has been mentally injured and that the source of the injury is the Appellant's exploitation of R[] by her use of sexual abuse allegations, investigations and examinations which encourages the development and reinforcement of aberrant behavior by drawing R[] in a closer relationship to the Appellant. (Dept. 19)

The ALJ, thus, affirmed the Department's finding of indicated child abuse, mental injury, by Ms. McClanahan. In doing so, the ALJ used language upon which the Majority seizes regarding Ms. McClanahan's <u>motives</u>:

The evidence presented by the local department has led me to conclude that the Appellant's actions were either an intentional attempt to manipulate and influence the outcome of an ongoing custody dispute with R[]'s father, or were a result of her subconscious efforts to have R[] remain close to her. A finding of indicated abuse mental injury is appropriate as the Appellant's actions have resulted in the mental injury of R[].

The Majority, however, in doing so, obviates the ALJ's finding that Ms. McClanahan's *actions*, which include *reporting* sexual abuse allegations, *taking* R to various hospitals for treatment, and *subjecting* R to intrusive sexual examinations, were intentional and "resulted in the mental injury of R" and that the ALJ specifically found that Ms. McClanahan's "act of making multiple allegations of sex abuse of R[] by her father and subjecting R[] to repeated sexual abuse exams constitutes child abuse mental injury."

4

The first holding of the Majority with which I disagree, however, is that the standard used in *Taylor*, a child abuse physical injury case, should be applied in a child abuse, mental injury, case. In *Taylor*, the father's act of kicking a footstool that hit his daughter without intent to hurt the child did not constitute child abuse, physical injury. In that case, the ALJ had applied Section 5-701(b)(1)[2] of the Family Law Article and rejected the father's defense of "accident" as encompassed by the ruled out provision of COMAR 07.02.07.12C(2)(a)(i),[3] which stated that:

> A finding of ruled out child abuse is appropriate if child abuse did not occur. A finding of ruled out may be based on credible evidence that:
>                              * * *
> (2) In the case of physical abuse:
> (a) The alleged abuser was not responsible for the injury for reasons including, but not limited to, one of the following:

---

[2] Section 5-701(b) of the Family Law Article of the Maryland Code (1984, 1999 Repl. Vol., 2004 Supp.) defined 'abuse' and provided:
> (1) the physical or mental injury of a child by any parent or other person who has permanent or temporary care or custody or responsibility for supervision of a child, or by any household or family member, under circumstances that indicate that the child's health or welfare is harmed or at substantial risk of being harmed; or
> (2) sexual abuse of a child, whether physical injuries are sustained or not.

[3] Following *Taylor*, in 2007, COMAR 07.02.07.12C(2)(a)(i) was amended to "restate the language more clearly, consistent with [*Taylor*]". 34 Md. Reg. 2025 (November 9, 2007) and it now provides:

> A finding of ruled out child abuse is appropriate if child abuse did not occur. A finding of ruled out may be based on credible evidence that:
>                              * * *
> (2) In the case of physical abuse:
> (a) The alleged abuser was not responsible for the injury for reasons including, but not limited to, one of the following:
>         (i) The contact with the child was accidental and unintended and under the circumstances, the injury was not foreseeable[]

.

5

> > (i) The act causing the injury was accidental or unintentional and not reckless or deliberate[]

*Id.* at 225-26, 862 A.2d at 1033. We determined that the father's act of kicking the stool was "unintentional", such that physical child abuse was ruled out.

The *Taylor* holding, however, is totally inapplicable to a child abuse, mental injury, case, because by its very terms COMAR 07.02.07.12C(2)(a)(i), then and now, is limited in scope to "physical injury." The Majority points to nothing to support its conclusion that it "decline[s] to enforce the portion of COMAR 07.02.07.12C that limits its exculpatory scope (for accidental injury) to alleged abusers causing physical injury." Maj. Slip Op. at 19. Clearly, physical abuse is different from mental abuse not only in the types of acts of the perpetrator and the harm experienced by the child victim, but, most importantly, in the recognition that physical injury can result from accidental or unintended acts while mental injury of a child by a caretaker cannot. The Majority does not cite any basis for its lumping physical and mental abuse together, nor can I discern any.

Even assuming *Taylor's* holding can apply in the context of mental injury, with which I vehemently disagree, the Majority, nevertheless, errs because of its emphasis on a piece of the opinion by the ALJ that Ms. McClanahan's actions were "a result of her subconscious efforts" to rule out child abuse, mental injury. Here, Ms. McClanahan's acts met the standard of intentional abuse, not accidental injury.

The Majority equates the ALJ's discussion of subconscious motive with unintentional acts when it states that "[a] standard of liability reaching the subconscious

6

level veers much too close to strict liability for parental decisions", Maj. Slip Op. at 20, thereby conflating motive and intention. The ALJ never said that Ms. McClanahan's conduct was *unintentional* or *unconscious* but rather was specific in finding intention and volition in the acts of Ms. McClanahan when stating: "I have found that [Ms. McClanahan's] act of making multiple allegations of sex abuse of R[] by her father and subjecting R[] to repeated sexual abuse exams constitutes child abuse mental injury." The ALJ also found that Ms. McClanahan's "exploitation" of R by "her use of sexual abuse allegations, investigations and examinations" caused R's mental injury. The ALJ, thus, consistently found Ms. McClanahan's conduct to be volitional and intentional.

The important distinction between subconscious motive and intentional acts has been persuasively articulated in *Johnson v. Metropolitan Life Ins. Co.*, 273 F. Supp. 589, 593 (D.N.J. 1967), *aff'd*, 404 F.2d 1202 (3d Cir. 1968). In *Johnson*, a widow of a man who committed suicide sought to recover under a policy excluding death benefits from a suicide, under a number of theories, one of which was that her husband was "irresistibly compelled by impulse to immolate himself, and therefore, that his action was no more the product of a conscious intent that [sic] would be a purely accidental act". *Id.* at 594. The Court rejected the widow's theory and explained:

> In this regard, one must be careful to distinguish questions of intent and questions of motive. Psychoanalytically oriented and other schools of "depth psychology" have made the notions of "unconscious" or "subconscious" motive common parlance. But it is not helpful to define "suicide" as an intentional self-destruction, and then to confuse the slippery notion of "intent" with its underlying causes.
> Whatever the constellation of drives, impulses or subconscious motives which cause the subject to perform a given act, unless that act is actually inadvertent, its physical execution is "intentional" in the ordinary

7

sense of the word. In short, my motive for doing, or impulse to do, the act is one thing; the fact that I therefore intend to do it and do so is a separate point and one that is not here in doubt.

*Id*. In the present case, Ms. McClanahan intended to subject her child to nine sexual examinations and fourteen investigations, all of which resulted in mental injuries. Ms. McClanahan's motives, as found by the ALJ, included "to manipulate and influence the outcome of an ongoing custody dispute" or to "have R[] remain close to her." Ms. McClanahan's actions were not inadvertent or beneficent but were intentional and caused injury to R.

I would affirm. Judge McDonald authorizes me to state that he joins the views expressed in this dissenting opinion.